

201 ST. CHARLES AVENUE
SUITE 3600
NEW ORLEANS, LOUISIANA 70170
PHONE: 504-566-5200
FAX: 504-636-4000
www.bakerdonelson.com

LAURA E. CARLISLE
**Direct Dial**: (504) 566-8643
**Direct Fax**: (504) 585-6943
**E-Mail**: lcarlisle@bakerdonelson.com

August 3, 2016

**<u>VIA FACSIMILE (985) 809-8777</u>**
Clerk of Court
22nd Judicial District Court
Parish of St. Tammany
St. Tammany Parish Justice Center
701 N. Columbia Street
Covington, LA 70433

        Re:    *Cardiovascular Care Group, Inc., Louisiana Medical Center and Heart Hospital,*
                  *LLC and LMCHH PCP, LLC v. eClinicalworks, LLC, Change Healthcare*
                  *Holdings, Inc., Neurological Surgery of Covington, PLLC and*
                  *Dr. Alan M. Weems, M.D.*
                  22nd JDC, Docket No. _____
                  Our File: 2921692.000020

Dear Sir and/or Madam:

      Attached please find Petition for Damages, *Ex Parte* Motion for Leave to File Exhibits A, B, C, And D to the Petition for Damages and Order, and Request for Notice, which we ask that you file with the Court on behalf of Plaintiffs, Cardiovascular Care Group, Inc., Louisiana Medical Center and Heart Hospital, LLC, and LMCHH PCP, LLC.  Once we have received your fax confirmation, we will forward the originals to you along with our check for the filing, fax and service fees associated with this request.

      Thank you for your assistance in this matter, and if you have any questions, please do not hesitate to contact us.

      With kindest regards, I remain

                      Sincerely,

                      */s/ Laura E. Carlisle*

                      Laura E. Carlisle

LEC/sdt
Attachments

NO LEC 948358 v1
2921692-000020

22ND JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. TAMMANY

STATE OF LOUISIANA

NO. _____                                            DIVISION _____

CARDIOVASCULAR CARE GROUP, INC.; LOUISIANA MEDICAL CENTER AND
HEART HOSPITAL, LLC; and LMCHH PCP, LLC

VERSUS

eCLINICALWORKS, LLC; CHANGE HEALTHCARE HOLDINGS, INC.;
NEUROLOGICAL SURGERY OF COVINGTON, PLLC; and
DR. ALAN M. WEEMS, M.D.

FILED: _____        _____

                                                          DEPUTY CLERK

---

### PETITION FOR DAMAGES

---

NOW INTO COURT, through undersigned counsel, come Plaintiffs, Cardiovascular Care Group, Inc. ("CCG"); Louisiana Medical Center and Heart Hospital, LLC (the "Hospital"); and LMCHH PCP, LLC (the "Medical Group") (together with CCG and the Hospital, "Plaintiffs"), and file this Petition for Damages against Defendants, eClinicalWorks, LLC ("eCW"), Change Healthcare Holdings, Inc. ("Change Healthcare"), Neurological Surgery of Covington, PLLC ("Neurological Surgery of Covington"), and Dr. Alan M. Weems, M.D. ("Dr. Weems") (together with Neurological Surgery of Covington, "NSC"), in support of which Plaintiffs allege as follows:

I.      NATURE OF THE CASE

1.

This is a civil action for breach of contract, negligence, conversion, fraud, payment of a thing not owed, and unjust enrichment arising out of the wrongful receipt and retention of approximately $1 million of the Medical Group's funds by NSC.  NSC erroneously received those funds because, over a 19-month period, Defendants eCW and Change Healthcare erroneously sent more than 18,000 payments intended for the Medical Group to NSC.  The monthly totals of those payments were approximately four times the amounts to which NSC was entitled and otherwise accustomed to receiving.  Over time, NSC realized that, every month, it was receiving approximately four times the amount of money to which it was entitled.  Nonetheless, NSC remained silent and permitted the payment stream to continue.  Ultimately,

the Medical Group realized funds were being misdirected and asked eCW and Change Healthcare to investigate.   eCW and Change Healthcare performed this investigation and admitted they had made a "setup error" that had resulted in misdirection of the 18,000 payments into the account of Neurological Surgery of Covington.   CCG advised NSC of this error; however, NSC has failed and refused to repay the misdeposited funds.

## II.   PARTIES

2.

Plaintiff CCG is a healthcare investment company that builds physician-led, patient-centric healthcare delivery systems in small to mid-size urban markets. CCG is a Delaware corporation with its principal place of business at 3322 West End Avenue, Suite 1100, Nashville, Tennessee 37203.   With its physician partners, CCG owns approximately 95% of the membership interests in, and manages, the Hospital.

3.

Plaintiff Hospital is a North Carolina limited liability company owned by CCG and its physician partners, with a principal place of business at 64030 Louisiana Hwy. 434, Lacombe, Louisiana 70445.   The Hospital provides a full range of inpatient and outpatient medical, surgical, and diagnostic services covering more than thirty-five specialties, including cardiovascular disease, orthopedics, vascular and general surgery, urology, gastroenterology, and neurology.   The Hospital provides accounting services to the Medical Group and, when necessary, funds the Medical Group's cash shortfall by borrowing funds under an interest-bearing working capital note with CCG.

4.

Plaintiff Medical Group is a Delaware limited liability company that is a wholly-owned subsidiary of the Hospital.   It has a principal place of business at 64030 Louisiana Hwy. 434, Lacombe, Louisiana 70445.   The Medical Group operates 18 outpatient locations in Louisiana and Mississippi, and it directly employs 48 physicians.

5.

Defendant eCW is a privately-held Massachusetts limited liability company and the leading cloud-based electronic health records ("EHR") company in the healthcare industry, used by over 115,000 providers and 800,000 medical professionals.   Its 2015 revenues exceeded

$400 million.   Its principal place of business is at 2 Technology Drive, Westborough, Massachusetts 01581.

6.

Defendant Change Healthcare is a Delaware corporation and the single largest financial and administrative healthcare network in the United States, reaching approximately 750,000 physicians, 105,000 dentists, 60,000 pharmacies, 5,000 hospitals, 600 vendors, 450 laboratories and 1,200 government and commercial payers, with revenues in excess of $311 million in the first quarter of 2016.   Its primary place of business is at 3055 Lebanon Pike, Nashville, Tennessee 37214.

7.

Defendant Neurological Surgery of Covington is a professional limited liability company incorporated under the laws of Louisiana, with its principal place of business at 94 Cardinal Lane, Mandeville, Louisiana, 70474.  It is owned and operated by Defendant Dr. Weems, who is its sole practitioner.

8.

Defendant Dr. Weems is a neurosurgeon who owns and operates Neurological Surgery of Covington through which he maintains a medical practice.  In exchange for administrative and management services provided to the practice by the Medical Group, including billing and collection services, Dr. Weems pays the Medical Group a set fee for rent, as well as a percentage of his collected fees.

### III.        JURISDICTION AND VENUE

9.

This court has original jurisdiction over this action pursuant to La. Const. art. V, § 16.

10.

This court has personal jurisdiction over Defendant eCW pursuant to La. Rev. Stat. § 13:3201(1) because the causes of action in this Petition arise out of eCW's transaction of business in this state.

11.

This court has personal jurisdiction over Defendant Change Healthcare pursuant to La. Rev. Stat. § 13:3201(1) because the causes of action in this Petition arise out of Change Healthcare's transaction of business in this state.

12.

This court has personal jurisdiction over Defendant Neurological Surgery of Covington because it is a professional limited liability company incorporated under the laws of this state and with its principal place of business in this state.

13.

This court has personal jurisdiction over Defendant Dr. Weems because he is a citizen and resident of this state.

14.

Venue is proper pursuant to La. Code Civ. P. arts. 42 and 74, among other articles.

IV.     FACTS

A.      *eCW Undertakes the Billing and Collections Work for the Medical Group,*
        *Neurological Surgery of Covington, and CTS, and Engages Change Healthcare*
        *to Perform the Bank Cash Management Services.*

15.

In early 2014, CCG began searching for a new vendor to provide services to the Medical Group in four key, highly specialized areas: Medical Practice Management, Electronic Medical Records, Patient Portal Services, and Healthcare Billing and Collecting.

16.

In conjunction with this search, CCG met with representatives from eCW who made representations about eCW's capabilities in all four areas.  Specifically, eCW represented it was a leading vendor with excellent capabilities in Medical Practice Management, Electronic Medical Records, Patient Portal Services, and Healthcare Billing and Collecting, and that it could provide top quality banking cash management system capabilities by subcontracting that work to Emdeon, Inc. (now Change Healthcare).

17.

CCG relied on these representations in deciding to engage eCW (and thus Change Healthcare) to provide the Medical Group with Medical Practice Management, Electronic Medical Records, Patient Portal Services, and Healthcare Billing and Collecting.

18.

On or about March 20, 2014, CCG and eCW entered the eClinicalWorks Software License and Support Cloud Agreement for Electronic Medical Records and Practice

4

Management (the "CCG-eCW Agreement"). A copy of that agreement is attached as **Exhibit A** *(filed under seal)* and incorporated as if fully set forth herein.[1]

19.

Pursuant to the CCG-eCW Agreement, eCW agreed to provide a full suite of services to the Medical Group, including a comprehensive EHR system, cloud storage, patient portal, practice management software, and revenue cycle management / billing service clearinghouse. The pricing for this suite included a one-time fee of $97,250.

20.

With regard to the revenue cycle management / billing service component, eCW agreed, *inter alia*, to:

      a.  create claims from encounters within the eCW electronic medical records system;

      b.  send claims electronically to a claims clearinghouse;

      c.  post payments and adjustments;

      d.  prepare monthly financial statements;

      e.  prepare reports meeting reasonable business needs; and

      f.  assign a customer advisor to manage receivables.

See Ex. A.

21.

The CCG-eCW Agreement expressly provides that eCW "warrants that the Services provided hereunder will be performed in a competent and workmanlike manner, which meets or exceeds industry standards." See Ex. A at 11.

22.

As consideration for the suite of services provided by eCW, CCG agreed to pay approximately $100,000 per month, commencing on July 1, 2014.

23.

CCG has made each and every one of the monthly payments required by the CCG-eCW Agreement, for a total amount of approximately $1,641,000.

24.

One of eCW's fundamental obligations under the CCG-eCW Agreement was to provide a billing and collections service, under which it would bill and collect payments owed by patients

---

[1] The exhibits to this Petition are agreements that contain confidential terms and/or confidential information such as bank account numbers. For that reason, the exhibits are being filed pursuant to a motion for leave to file under seal.

and insurers; categorize the payments by federal tax employer identification number; and route send payments to the intended payee's bank account by the respective federal tax identification numbers.

25.

CCG engaged eCW to provide this billing and collections service to the Medical Group, as well as to Neurological Services of Covington and Cardiothoracic Surgery PA ("Cardiothoracic Surgery" or "CTS"), the respective medical practices of Dr. Weems and Dr. Louis Hebert ("Dr. Hebert").

26.

eCW subcontracted its banking system management of cash to Emdeon, Inc. (soon thereafter re-branded "Change Healthcare"), with Change Healthcare to commence this obligation beginning no later than October 2014.   The system is provided through bank "lockboxes."

27.

Pursuant to their billing and collection service, eCW was to send insurance claim forms and patient statements for the various payments owed to the Medical Group, to Neurological Surgery of Covington, and to CTS, all based on federal tax identification number.

28.

Also pursuant to this obligation, eCW and Change Healthcare were to receive insurance and patient payments not directly deposited via electronic funds transfer ("EFT") by collecting those payments via "lockboxes" located in Salt Lake City (for non-EFT insurance payments) and Dallas (for non-EFT patient payments).

29.

After reaching the lockbox, each payment was to be directed to one of three electronic "mailstops:" (1) the mailstop for the Medical Group; (2) the mailstop for Neurological Surgery of Covington; or (3) the mailstop for CTS, all based on federal tax identification number.

30.

In conjunction with the transition to their service, eCW and Change Healthcare required the Medical Group, Neurological Surgery of Covington, and CTS to enroll in the "Emdeon Patient Lockbox" account program.

6

31.

The Medical Group, Neurological Surgery of Covington, and CTS accurately and fully completed the lockbox enrollment forms with their names, federal tax identification numbers, bank routing numbers, and bank account numbers, and the forms were submitted to Change Healthcare.

32.

On its lockbox form, the Medical Group directed Change Healthcare to deposit its payments into its Bank of America account, as authorized in the "Authorization Agreement for Direct Deposits (ACH Credits)" provision.  A true and correct copy of the Medical Group lockbox enrollment form is attached as **Exhibit B** (*filed under seal*) and incorporated as if fully set forth herein.

33.

Neurological Surgery of Covington directed Change Healthcare to deposit its payments into its Regions Bank account, as authorized in the "Authorization Agreement for Direct Deposits (ACH Credits)" provision.  A true and correct copy of the Neurological Surgery of Covington lockbox enrollment form is attached hereto as **Exhibit C** (*filed under seal*) and incorporated as if fully set forth herein.

34.

CTS directed Change Healthcare to deposit its payments electronically into its JP Morgan Chase bank account, as authorized in the "Authorization Agreement for Direct Deposits (ACH Credits)" provision.  A true and correct copy of the CTS lockbox enrollment form is attached hereto as **Exhibit D** (*filed under seal*) and incorporated as if fully set forth herein.

35.

Contemporaneously with the receipt and re-transmission of the patient payments, Change Healthcare generated and sent to eCW 835-style healthcare claim payment and remittance advice forms, which showed patient-by-patient payments made to the Dallas lockbox so that eCW could post the payments to each patient's account.  By this means, eCW and Change Healthcare confirmed to Plaintiffs that the payments had been received from patients and credited to the appropriate payee.

36.

Pursuant to its contract with CCG, eCW generated account-receivable reports for the Medical Group, Neurological Surgery of Covington, and CTS, showing that patient payments had been deposited and listing them by date and amount.

37.

The Medical Group, Neurological Surgery of Covington, and CTS account-receivable reports were intended to show that the patient payments listed were correctly deposited to the bank accounts of the Medical Group, Neurological Surgery of Covington, and CTS, respectively; however, the reports did not expressly identify the bank or account into which the payments had been deposited.

38.

It later became known that two of the six "lockbox" links were set up in error.  As a result, Neurological Surgery of Covington began to receive insurance payments intended for CTS and patient payments intended for the Medical Group.

39.

eCW and Change Healthcare knew or should have known that Plaintiffs were relying on them to accurately bill amounts owed, to receive all payments made, and to transmit all payments to the correct bank account of the intended payee.

40.

A standard mechanism for confirming that payments have been "linked" to the correct bank account is integration testing.

41.

It is vital to perform integration testing, because, once a mailstop is "linked" to a bank account, payments received by that mailstop are automatically directed into the "linked" bank account.

42.

Plaintiffs sought to confirm that eCW and Change Healthcare had correctly linked each mailstop to the relevant bank account and thus would be accurately transmitting payments to the intended payee; accordingly, Plaintiffs asked eCW and Change Healthcare whether they had performed integration testing or intended to do so.

43.

eCW and Change Healthcare advised Plaintiffs that all necessary integration testing would be performed and thus Plaintiffs could be assured that all payments directed to the Medical Group, Neurological Surgery of Covington, and CTS would reach the intended payee's bank account.

44.

Plaintiffs reasonably relied on the representations of eCW and Change Healthcare regarding integration testing.

45.

eCW and Change Healthcare failed to complete the promised integration testing and thus failed to confirm that payments received at the lockboxes were directed to the correct bank accounts. Therefore, eCW and Change Healthcare failed to realize that 100% of patient check payments intended for the Medical Group would be automatically mis-deposited into the Neurological Surgery of Covington bank account.

46.

The failure of eCW and Change Healthcare to perform meaningful integration testing and thus deliver a functional billing and collections system has imposed significant, ongoing, costly burdens for CCG's management team and the Hospital's accounting and billing personnel.

B.  *Problems Arise with the Implementation of the eCW and Change Healthcare Services.*

47.

The Medical Group's transition to using eCW and Change Healthcare for revenue cycle management was plagued with problems.

48.

The Medical Group experienced ongoing difficulty in obtaining service from eCW representatives, whose language skills were inadequate, who were largely unavailable during Central Time Zone business hours, who failed to address or resolve problems successfully, and who took weeks or months to respond to complaints, despite the Medical Group's constant requests for assistance.

49.

Such difficulties were material, but Plaintiffs continued to rely on ongoing assurances from eCW and Change Healthcare that the difficulties would be resolved and that Plaintiffs could rely on the quality and integrity of the services being provided by eCW and Change Healthcare.

50.

Notwithstanding these assurances, the service provided by eCW and Change Healthcare fell below industry standards and the contractual obligations of eCW and Change Healthcare. For example, eCW and Change Healthcare made a linkage error in the Salt Lake City lockbox, such that insurance payments sent to the CTS mailstop were directed to the NCS bank account.

51.

eCW and Change Healthcare failed to detect this linkage error, despite the fact that successful integration testing would have identified the error.

52.

CTS identified the error, Plaintiffs brought it to the attention of eCW and Change Healthcare, and the error was rectified after a moderate delay.

53.

Following discovery of the linkage error, Plaintiffs sought assurances from eCW and Change Healthcare that the remaining five mailstop-bank account links were correct. eCW and Change Healthcare assured Plaintiffs repeatedly that all links were correct.

54.

Plaintiffs reasonably relied on those representations.

55.

Those representations were false.

56.

The false representations made by eCW and Change Healthcare have imposed significant, ongoing, costly burdens for CCG's management team and the Hospital's accounting and billing personnel.

C.      *eCW and Change Healthcare Misdeposit $1 Million of the Medical Group's*
        *Money into the Bank Account of Neurological Surgery of Covington.*

57.

In conjunction with the implementation of the eCW and Change Healthcare services, Plaintiffs sought a way to reconcile the incoming payments with the Medical Group bank account.

58.

eCW and Change Healthcare did not perform such reconciliations, failed to provide data sufficient to allow Plaintiffs to perform a reconciliation of the insurance payments made through the Salt Lake City lockbox, and refused to provide Plaintiffs access to the "eCashiering" program that would permit Plaintiffs to perform a reconciliation of the payments made through the Dallas lockbox.

59.

After repeated requests from Plaintiffs, eCW and Change Healthcare began to provide additional and more-detailed back-up information, including granting Plaintiffs access in March 2016 to eCashiering.

60.

Upon reviewing records available exclusively through eCashiering in March 2016, Plaintiffs learned that eCW and Change Healthcare had misdirected more than 18,000 patient payments intended for the Medical Group to some other recipient - a recipient whose identity eCW and Change Healthcare could not at that time determine and who was unknown to Plaintiffs.

61.

Plaintiffs immediately advised eCW and Change Healthcare of the misdirected payments and asked that future payments be correctly deposited and past errors be identified as soon as possible.

62.

Change Healthcare advised Plaintiffs it would investigate the misdirected payments to determine their cause and how to stop future misdirected payments.

63.

Weeks passed, and neither eCW nor Change Healthcare communicated to Plaintiffs the cause of the problem or how they planned to correct it.

64.

Finally, after repeated and increasingly urgent inquiries by Plaintiffs, Change Healthcare advised Plaintiffs "there was a set up issue with the account," some of which had been corrected, though neither eCW nor Change Healthcare could at that time provide a list of the misdirected deposits.

65.

Finally, in April 2016, eCW and Change Healthcare sent Plaintiffs a spreadsheet of payments they believed had been erroneously deposited into the bank account of NSC, rather than the bank account of the intended payee: the Medical Group.

66.

The spreadsheet showed that, beginning in October 2014, Neurological Surgery of Covington had received daily deposits of funds intended for the Medical Group.

67.

These deposits continued until Plaintiffs discovered the error in March 2016.

68.

The payments total approximately $1 million and represent more than 18,000 patient payments.

D. *NSC Fails to Advise CCG, the Hospital, or the Medical Group*
*that NSC is Receiving Four Times the Amount of Money to which NSC is Entitled.*

69.

Neither Neurological Surgery of Covington nor Dr. Weems ever notified Plaintiffs that, after the eCW/Change Healthcare system went live in October 2014, Neurological Surgery of Covington began receiving more than ***four times*** its historical monthly payment amount.

70.

After discovering in April 2016 that NSC had erroneously received approximately $1 million intended for the Medical Group, Plaintiffs contacted NSC to ask NSC to return the money.

71.

To date, NSC has not returned any of the approximately $1 million erroneously deposited into the Neurological Surgery of Covington account.

12

72.

The diversion to NSC of $1 million of its money has caused the Medical Group to suffer a cash shortfall.

73.

The Hospital has had to fund this cash shortfall by borrowing under an interest bearing working capital note with CCG.

## V.      CAUSES OF ACTION

*COUNT I – Breach of Contract Against eCW*

74.

Plaintiffs restate and re-allege each of the foregoing allegations in paragraphs 1 – 73 as if fully stated herein.

75.

The CCG-eCW Agreement is governed by the laws of the Commonwealth of Massachusetts.

76.

Under Massachusetts law, a plaintiff may establish a *prima facie* case of breach of contract by showing: (a) there is a contract, (b) the plaintiff performed its duties under the contract, (c) the defendant breached the contract, and (d) the plaintiff suffered damages as a result of the defendant's breach.

77.

eCW had a duty to Plaintiffs under the CCG-eCW Agreement to provide revenue cycle management / billing services consistent with reasonable business practices.

78.

eCW specifically agreed to perform the services under the CCG-eCW Agreement "in a competent and workmanlike manner, which meets or exceeds industry standards." See Ex. A at 11.

79.

Such services require, among other things, providing reasonable customer support, including meaningful and timely responses to customer requests, properly undertaking and completing integration testing, engaging and supervising subcontractors who can and will perform their contractual obligations in a workmanlike and professional manner, and ensuring

13

that payments remitted reach the intended payee's bank account.

80.

Misdirecting payments intended for one payee to the account of another falls below reasonable industry standards and the contractual obligations undertaken by eCW.

81.

The misdirecting of payments intended for CTS to the account of Neurological Surgery of Covington is a material breach of eCW's obligations under the CCG-eCW Agreement and eCW's agreement to perform the work under the Agreement in a competent and workmanlike manner, which meets or exceeds industry standards.

82.

The misdirecting of payments intended for the Medical Group to the account of Neurological Surgery of Covington is a material breach of eCW's obligations under the CCG-eCW Agreement and eCW's agreement to perform the work under the Agreement in a competent and workmanlike manner, which meets or exceeds industry standards.

83.

Plaintiffs have suffered actual and direct damages in excess of $1 million as a result of eCW's breaches.

*COUNT II – <u>Breach of Contract Against Change Healthcare</u>*

84.

Plaintiffs restate and re-allege each of the foregoing allegations in paragraphs 1 – 83 as if fully stated herein.

85.

Contracts confer third-party beneficiary status, or a stipulation *pour autrui*, where the contract stipulates a benefit for a third person and that stipulation is manifestly clear, there is certainty as to the benefit provided to the third party, and the benefit is not a mere incident of the contract between the promisor and the promisee.

86.

In agreeing that Change Healthcare would provide its banking system management of cash in connection with the CCG-eCW agreement, eCW and Change Healthcare clearly and definitely stipulated a benefit for Plaintiffs.

14

87.

The CCG-eCW Agreement for which Change Healthcare subcontracted provided certainty regarding the benefit to be provided to Plaintiffs.

88.

Because Change Healthcare was eCW's subcontractor on the CCG-eCW Agreement, the benefit to Plaintiffs was not a mere incident of the contract between eCW and Change Healthcare.

89.

The services provided by Change Healthcare were the same banking system management of cash services owed to Plaintiffs by eCW as provided in the CCG-eCW Agreement and the Emdeon Patient Lockbox Client Enrollment and Account Update Form.

90.

Change Healthcare failed to perform these services accurately and professionally.

91.

As a result of this failure, Change Healthcare erroneously deposited more than payments into Neurological Surgery of Covington's bank account that were intended as payments for CTS.

92.

In addition, as a result of this failure, Change Healthcare erroneously deposited more than 18,000 payments over a period of nineteen months, totaling approximately $1 million, into Neurological Surgery of Covington's bank account that were intended as payments for the Medical Group.

93.

On information and belief, those erroneous deposits are a material breach of Change Healthcare's obligations to eCW.

94.

The erroneous deposits are also a material breach of Change Healthcare's obligations to Plaintiffs pursuant to the authorization agreement contained in the lockbox enrollment form.

95.

The erroneous deposits harmed Plaintiffs in an amount in excess of $1 million.

COUNT III – _Breach of Contract Against Change Healthcare_

96.

Plaintiffs restate and re-allege each of the foregoing allegations in paragraphs 1 – 95 as if fully stated herein.

97.

Change Healthcare undertook an obligation to deposit payments owed to the Medical Group electronically into the Medical Group's Bank of America account, as evidenced by the Emdeon Patient Lockbox Client Enrollment and Account Update Form.  See Exhibit B.

98.

Change Healthcare failed to properly deposit payments owed to the Medical Group into the Medical Group's Bank of America account.   In fact, Change Healthcare erroneously deposited nearly $1 million of the Medical Group's money into NSC's bank account.

99.

Change Healthcare's erroneous deposits were a material breach of its agreement to deposit payments owed to the Medical Group into the Medical Group's Bank of America account.

100.

Plaintiffs have suffered actual and direct damages in excess of $ 1 million as a result of Change Healthcare's breaches.

COUNT IV – _Negligence Against eCW_

101.

Plaintiffs restate and re-allege each of the foregoing allegations in paragraphs 1 – 100 as if fully stated herein.

102.

To establish a _prima facie_ claim of negligence, a plaintiff must show that:   (a) the defendant owed the plaintiff a duty of care; (b) the defendant breached the duty of care owed to the plaintiff; (c) the risk of harm to the plaintiff was within the scope of protection afforded by the duty breached; (d) the defendant's conduct was a cause-in-fact of the resulting harm suffered by the plaintiff; and (e) the plaintiff was damaged.

103.

eCW owed a duty of care to Plaintiffs with regard to negotiating, forming, entering, and implementing subcontractual agreements as to any or all provisions of the CCG-eCW Agreement.

104.

eCW negotiated, formed, entered, and implemented a subcontractual agreement with Change Healthcare as to provisions of the CCG-eCW Agreement.

105.

In so doing, eCW failed to abide by a reasonable standard of care and thus breached its duties to Plaintiffs.

106.

As a direct result, Plaintiffs were harmed.

107.

This harm was reasonably foreseeable and within the scope of protection afforded by the duty breached.

108.

As a result of eCW's breach, Plaintiffs suffered harm in the form of damages in excess of $1 million.

*COUNT V – Negligence Against Change Healthcare*

109.

Plaintiffs restate and re-allege each of the foregoing allegations in paragraphs 1 – 108 as if fully stated herein.

110.

Change Healthcare is the single largest financial and administrative healthcare network in the United States, and has been developing its network of payers and providers for over 30 years in the industry, connecting virtually all private and government payers, claim-submitting providers and pharmacies in a hybrid cloudbased, user-centric and secure infrastructure environment.

111.

Change Healthcare is a large and sophisticated provider of banking services to its clients, including Plaintiffs.

17

112.

Change Healthcare undertook responsibility for obtaining payments owed to the Medical Group by patients and insurers and then distributing those payments into the correct account at Bank of America.

113.

Change Healthcare failed to adhere to a reasonable standard of care in undertaking and performing these duties.

114.

That failure caused Plaintiffs to be harmed by the erroneous deposit into Neurological Surgery of Covington's account of numerous payments intended for the Medical Group and CTS, including over 18,000 patient payments intended for the Medical Group over a period of 19 months totaling approximately $1 million.

115.

The harm to Plaintiffs was proximately caused by Change Healthcare.

*COUNT VI – <u>Negligent Misrepresentation Against eCW and Change Healthcare</u>*

116.

Plaintiffs restate and re-allege each of the foregoing allegations in paragraphs 1 – 115 as if fully stated herein.

117.

Near the outset of Plaintiffs' 2014 transition to eCW's revenue cycle management and billing and collection services (including Change Healthcare's banking services), eCW and Change Healthcare advised Plaintiffs that "integration testing" would be performed on the lockbox system to confirm that payments would be directed to the correct lockbox.

118.

Subsequently, also in connection with that 2014 transition, eCW and Change Healthcare advised Plaintiffs that the integration testing had been successfully accomplished, confirming that all six "links" between the lockboxes and the payees' accounts were correctly working and each payee's funds were being sent to that payee rather than to someone else.

119.

Notwithstanding those representations, eCW and Change Healthcare failed to conduct integration testing and thus failed to realize that two of the six lockbox links were defective – in other words, that those two links were sending payments to NSC that were intended for the Medical Group and CTS.

120.

Plaintiffs learned that certain payments intended for CTS were being deposited into Neurological Surgery of Covington's account in 2015.

121.

Plaintiffs advised eCW and Change Healthcare of this situation.

122.

eCW and Change Healthcare investigated the situation, realized the NSC-CTS lockbox link was incorrectly set up, and corrected that error.

123.

After discovering the first lockbox error, eCW and Change Healthcare assured Plaintiffs that the problem was fixed and there was no reason to be concerned that other errors might exist within the system.

124.

Specifically, eCW and Change Healthcare advised Plaintiffs that they had conducted integration testing and thus Plaintiffs could rely on the integrity of all six lockbox links.

125.

Because eCW and Change Healthcare failed to conduct meaningful integration testing, eCW and Change Healthcare failed to realize the Dallas lockbox link to the Medical Group's account was faulty.

126.

As a result, eCW and Change Healthcare mistakenly deposited approximately $1 million of the Medical Group's money into the account of Neurological Surgery of Covington.

127.

eCW and Change Healthcare had a duty to supply correct information to Plaintiffs because it undertook responsibility for obtaining payments owed to the Medical Group by patients and insurers and then distributing those payments into the correct bank account.

128.

eCW and Change Healthcare breached this duty when they made representations regarding integration testing and that they had fixed problems that previously caused erroneous deposits, which were wholly false and made without regard to their truth or falsity.

129.

As a result of their reliance on eCW and Change Healthcare's misrepresentations and material omissions, Plaintiffs sustained harm in excess of $1 million.

COUNT VII – *Fraud Against Neurological Surgery of Covington and Dr. Weems*

130.

Plaintiffs restate and re-allege each of the foregoing allegations in paragraphs 1 – 129 as if fully stated herein.

131.

Neurological Surgery of Covington has had an ongoing banking relationship with Regions Bank beginning no later than October 2014 and continuing through the present.

132.

On information and belief, Regions Bank provided information to Neurological Surgery of Covington as its customer, including monthly bank account statements, electronic access to the Neurological Surgery of Covington bank account, and similar information.

133.

Through the information provided by Regions Bank, NSC knew or should have known that Neurological Surgery of Covington was receiving, each month, about four times the amount of revenue to which it was entitled.

134.

NSC was in frequent communication with Plaintiffs' accounting, billing, and management personnel, but NSC never advised any of these personnel that deposits totaling four to five times their historical amount and the reasonably expected amount were being deposited into NSC's account.

135.

Plaintiffs' personnel asked NSC to provide bank statements for the Neurological Surgery of Covington Regions Bank account in early 2015, when Plaintiffs became aware that some payments intended for CTS had been misdirected to NSC.

136.

NSC failed and refused to provide those Regions Bank statements throughout 2015 and 2016, despite Plaintiffs' repeated requests.

137.

NSC suppressed or omitted material information when they failed to alert Plaintiffs, at any time during the relevant nineteen-month period, that, every month, they were receiving payments that were more than quadruple the anticipated monthly amounts despite no change in the amount of work performed by NSC.

138.

NSC suppressed or omitted material information when NSC failed to alert Plaintiffs, at any time during the relevant nineteen-month period, that hundreds of thousands of dollars had been deposited into the Neurological Surgery of Covington Regions Bank Account via the eCW / Change Healthcare system, rather than the $6,000 to which Neurological Surgery of Covington was entitled to receive through its Regions Bank account.

139.

NSC had a duty to disclose their receipt of the excess payments because NSC knew that the money deposited into the Regions Bank account did not rightfully belong to Neurological Surgery of Covington or Dr. Weems.

140.

The suppression and omission by NSC of their erroneous receipt of the Medical Group's funds was made with the intent to gain an unjust advantage; specifically, to continue to receive monthly payments averaging approximately $50,000.00 in exchange for nothing.

141.

NSC's material omissions and misrepresentations injured Plaintiffs, as NSC received approximately $1 million of patient payments that rightfully belong to Plaintiffs, in violation of La. Civ. Code Ann. art. 1953.

142.

Pursuant to La. Civ. Code Ann. art. 1958, Plaintiffs are entitled to recovery of damages, including attorney's fees, because of the fraud committed by Dr. Weems and Neurological Surgery of Covington.

COUNT VIII -- *Conversion Against Neurological Surgery of Covington and Dr. Weems*

143.

Plaintiffs restate and re-allege each of the foregoing allegations in paragraphs 1 – 142 as if fully stated herein.

144.

Defendants Neurological Surgery of Covington and Dr. Weems acquired money belonging to Plaintiffs in an unauthorized manner when they received deposits of payments belonging to the Medical Group.

145.

NSC withheld possession of the funds from their rightful owner, the Medical Group.

146.

NSC wrongfully asserted ownership of the funds belonging to the Medical Group by failing and refusing to return the funds after being informed that the funds belonged to the Medical Group.

147.

Plaintiffs have been damaged by this conversion because Neurological Surgery of Covington and Dr. Weems refuse to return approximately $1 million rightfully belonging to the Medical Group.

COUNT IX – *Unjust Enrichment Against Neurological Surgery of Covington and Dr. Weems (In the Alternative)*

148.

Plaintiffs restate and re-allege each of the foregoing allegations in paragraphs 1 – 147 as if fully stated herein.

149.

Defendants Neurological Surgery of Covington and Dr. Weems were enriched by their receipt of approximately $1 million of the Medical Group's funds.

150.

The receipt by NSC of the Medical Group's funds impoverished Plaintiffs in the amount of approximately $1 million.

151.

There is a direct connection between NSC's enrichment and Plaintiffs' impoverishment, as Plaintiffs' impoverishment is solely due to NSC's erroneous receipt of Plaintiffs' funds.

152.

There is no justification for NSC's enrichment or Plaintiffs' impoverishment, as neither Neurological Surgery of Covington nor Dr. Weems has any right, title, or interest in the Medical Group's funds.

153.

Plaintiffs have no other remedy at law to rectify Neurological Surgery of Covington's and Dr. Weems' wrongful receipt of said funds.

154.

Neurological Surgery of Covington and Dr. Weems have therefore been enriched without cause at the expense of Plaintiffs and are bound to compensate Plaintiffs in the amount of that unjust enrichment pursuant to La. Civ. Code art. 2298.

*Count X – Payment of a Thing Not Owed Against*
<u>*Neurological Surgery of Covington and Dr. Weems*</u>

155.

Plaintiffs restate and re-allege each of the foregoing allegations in paragraphs 1 – 154 as if fully stated herein.

156.

Defendants Neurological Surgery of Covington and Dr. Weems received approximately $1 million of the Medical Group's funds – funds not owed to either Neurological Surgery of Covington or Dr. Weems.

157.

The approximately $1 million was not owed to either Neurological Surgery of Covington or Dr. Weems, because it was paid for an obligation that did not and does not exist.

158.

Defendants Neurological Surgery of Covington and Dr. Weems received approximately $1 million of the Medical Group's funds in bad faith, because Dr. Weems knew that the money

deposited into Neurological Surgery of Covington's Regions Bank account did not rightfully belong to Neurological Surgery of Covington.

159.

Defendants Neurological Surgery of Covington and Dr. Weems are bound to restore to the Medical Group the funds they wrongfully received, or the value of those funds, along with those funds' fruits and products, pursuant to La. Civ. Code arts. 2299, 2303, and 2304.

COUNT XI – *Corporate Veil*

160.

Plaintiffs restate and re-allege each of the foregoing allegations in paragraphs 1 – 159 as if fully stated herein.

161.

By failing to disclose Neurological Surgery of Covington's receipt of nearly $1 million of the Medical Group's funds, Dr. Weems used Neurological Surgery of Covington as his alter ego to engage in fraud and conversion, as set forth above, in violation of public policy.

162.

Upon information and belief, Dr. Weems commingled his funds with the funds in the Neurological Surgery of Covington bank account.

163.

Dr. Weems owns and operates Neurological Surgery of Covington and is its sole practitioner.

164.

Dr. Weems has failed to maintain arm's-length relationships on behalf of Neurological Surgery of Covington.

165.

Dr. Weems has failed to follow statutory formalities for transacting corporate affairs.

166.

Upon information and belief, Neurological Surgery of Covington has failed to hold regular meetings.

167.

For all these reasons, the Court should disregard Neurological Surgery of Covington's corporate status and hold Dr. Weems individually and personally liable for all claims alleged herein against Neurological Surgery of Covington.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that, after due proceedings are had, judgment be rendered in their favor and against Defendants eClinicalWorks, LLC, Change Healthcare Holdings, Inc., Neurological Surgery of Covington, PLLC, and Dr. Alan M. Weems, M.D. for all damages suffered, all of the aforementioned relief, and any other relief to which they are entitled, including:

1.     Damages against eCW and Change Healthcare for breach of contract, negligence, and negligent misrepresentation;

2.     Damages against Neurological Surgery of Covington and Dr. Weems for fraud, conversion, payment of a thing not owed, and/or unjust enrichment;

3.     A finding disregarding the corporate status of Neurological Surgery of Covington and a Judgment holding Dr. Weems individually and personally for all claims alleged herein against Neurological Surgery of Covington;

4.     An order of sequestration ordering the sequestration of funds in dispute as between the parties, as deemed necessary and appropriate under Louisiana Code of Civil Procedure article 3571;

5.     An award of pre- and post-judgment interest, plus Plaintiffs' costs, expenses, and attorneys' fees; and

6.     Any and all other monetary, legal, or equitable relief to which Plaintiffs may be entitled.

Respectfully submitted,

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**

Laura E. Carlisle (33760)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5275
Facsimile: (504) 636-3975
Email:  lcarlisle@bakerdonelson.com

*- and -*

Lea Carol Owen (TN BPR No. 19531)
    (*pro hac vice* application  to be filed)
Jesse Ford Harbison (TN BPR No. 032105)
    (*pro hac vice*  application to be filed)
Baker Donelson Center
211 Commerce Street, Suite 800
Nashville, Tennessee 37201
Telephone: (615) 726-5600
Facsimile: (615) 744-5610 (Facsimile)
Email:  cowen@bakerdonelson.com
Email:  jharbison@bakerdonelson.com

**ATTORNEYS FOR PLAINTIFFS**


**PLEASE SERVE:**

**Neurological Surgery of Covington, PLLC**
Through it registered agent
Alan M. Weems, M.D.
94 Cardinal Lane
Mandeville, Louisiana 70471

**Alan M. Weems, M.D.**
94 Cardinal Lane
Mandeville, Louisiana 70471


**TO BE SERVED VIA LOUISIANA LONG ARM
STATUTE, LA. REV. STAT. § 13:3201:**

**Change Healthcare Holdings, Inc.**
Through its registered agent
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

**eClinicalWorks, LLC**
Through its registered agent
Mahesh Navani
2 Technology Drive
Westborough, Massachusetts 01581

26

# EXHIBIT "A"

# (*Filed Under Seal*)

# EXHIBIT "B"

# (*Filed Under Seal*)

# EXHIBIT "C"

# (*Filed Under Seal*)

# EXHIBIT "D"
# (*Filed Under Seal*)

**22ND JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. TAMMANY**

**STATE OF LOUISIANA**

NO. _____                                    DIVISION _____

**CARDIOVASCULAR CARE GROUP, INC.; LOUISIANA MEDICAL CENTER AND
HEART HOSPITAL, LLC; and LMCHH PCP, LLC**

**VERSUS**

**eCLINICALWORKS, LLC; CHANGE HEALTHCARE HOLDINGS, INC.;
NEUROLOGICAL SURGERY OF COVINGTON, PLLC; and
DR. ALAN M. WEEMS, M.D.**

FILED: _____          _____

                                                              DEPUTY CLERK

---

***EX PARTE* MOTION FOR LEAVE TO FILE EXHIBITS A, B, C, AND D
TO THE PETITION FOR DAMAGES UNDER SEAL**

---

NOW INTO COURT, through undersigned counsel, come Plaintiffs, Cardiovascular Care

Group, Inc. ("CCG"); Louisiana Medical Center and Heart Hospital, LLC (the "Hospital"); and

LMCHH PCP, LLC (the "Medical Group") (together with CCG and the Hospital, "Plaintiffs"),

and respectfully request leave to file Exhibits A, B, C, and D to their Petition for Damages, filed

contemporaneously herewith, under seal.   The Exhibits contain confidential, proprietary

information and documents, all of which will be designated Confidential according to the

protective order to be proposed and agreed upon by the parties in this case.   The Exhibits are

attached hereto in a sealed envelope for filing under seal.

WHEREFORE, Plaintiffs respectfully request that this Motion be granted and that the

Exhibits to the Petition for Damages be filed under seal.

Respectfully submitted,

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**

Laura E. Carlisle (33760)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5275
Facsimile: (504) 636-3975
Email:  lcarlisle@bakerdonelson.com

*- and -*

Lea Carol Owen (TN BPR No. 19531)
      (*pro hac vice* application  to be filed)
Jesse Ford Harbison (TN BPR No. 032105)
      (*pro hac vice*  application to be filed)
Baker Donelson Center
211 Commerce Street, Suite 800
Nashville, Tennessee 37201
Telephone: (615) 726-5600
Facsimile: (615) 744-5610 (Facsimile)
Email:  cowen@bakerdonelson.com
Email:  jharbison@bakerdonelson.com

**ATTORNEYS FOR PLAINTIFFS**

**PLEASE SERVE
WITH PETITION FOR DAMAGES**

2

**22ND JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. TAMMANY**

**STATE OF LOUISIANA**

NO. _____                                                    DIVISION _____

**CARDIOVASCULAR CARE GROUP, INC.; LOUISIANA MEDICAL CENTER AND HEART HOSPITAL, LLC; and LMCHH PCP, LLC**

**VERSUS**

**eCLINICALWORKS, LLC; CHANGE HEALTHCARE HOLDINGS, INC.; NEUROLOGICAL SURGERY OF COVINGTON, PLLC; and DR. ALAN M. WEEMS, M.D.**

FILED: _____        _____

                                                                                DEPUTY CLERK

---

**ORDER**

---

Considering the foregoing *Ex Parte* Motion for Leave to File Exhibits A, B, C, and D to the Petition for Damages Under Seal filed by Plaintiffs, Cardiovascular Care Group, Inc., Louisiana Medical Center and Heart Hospital, LLC, and LMCHH PCP, LLC (the "Motion");

**IT IS ORDERED** that the Motion be and is hereby **GRANTED**, and that Exhibits A, B, C, and D to the Petition for Damages shall be filed under seal.

Covington, Louisiana, this the _____ day of August, 2016.

                                            _____
                                                        JUDGE

**22ND JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. TAMMANY**

**STATE OF LOUISIANA**

NO. _____                                          DIVISION _____

**CARDIOVASCULAR CARE GROUP, INC.; LOUISIANA MEDICAL CENTER AND HEART HOSPITAL, LLC; and LMCHH PCP, LLC**

**VERSUS**

**eCLINICALWORKS, LLC; CHANGE HEALTHCARE HOLDINGS, INC.; NEUROLOGICAL SURGERY OF COVINGTON, PLLC; and DR. ALAN M. WEEMS, M.D.**

FILED: _____          _____
                                                                        DEPUTY CLERK

---

**REQUEST FOR NOTICE**

---

NOW INTO COURT, through undersigned counsel, come Plaintiffs, Cardiovascular Care Group, Inc. ("CCG"); Louisiana Medical Center and Heart Hospital, LLC (the "Hospital"); and LMCHH PCP, LLC (the "Medical Group") (together with CCG and the Hospital, "Plaintiffs"), and, with full reservation of all rights, including exceptions, pursuant to Louisiana Code of Civil Procedure article 1572, request written notice ten (10) days in advance of the date fixed for the trial or hearing on any exception, motion, rule, or trial on the merits in the captioned proceeding, and, pursuant to Louisiana Code of Civil Procedure articles 1913 and 1914, request immediate notice of all interlocutory and final orders and judgments on any exceptions, motions, rules, or the trial on the merits in the captioned proceeding.

Respectfully submitted,

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**

Laura E. Carlisle (33760)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5275
Facsimile: (504) 636-3975
Email: lcarlisle@bakerdonelson.com

*- and -*

Lea Carol Owen (TN BPR No. 19531)
    (*pro hac vice* application to be filed)
Jesse Ford Harbison (TN BPR No. 032105)
    (*pro hac vice* application to be filed)
Baker Donelson Center
211 Commerce Street, Suite 800
Nashville, Tennessee 37201
Telephone: (615) 726-5600
Facsimile: (615) 744-5610 (Facsimile)
Email: cowen@bakerdonelson.com
Email: jharbison@bakerdonelson.com

**ATTORNEYS FOR PLAINTIFFS**

**PLEASE SERVE
WITH PETITION FOR DAMAGES**